IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Cory Johnson, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 06-1672 |
| | ) |
| -vs- | ) |
| | ) |
| New Brighton Area School District, | ) |
| John Osheka, Edward D. Kasparek, Jr., | ) |
| and Luca J. Passarelli | ) |
| | ) |
| Defendants. | ) |

AMBROSE, Chief District Judge.

## OPINION

Before me are Plaintiff's and Defendants' cross-motions for summary judgment. For reasons set forth in my opinion below, I am granting Defendants' motion and am denying Plaintiff's motion.

### I. Factual & Procedural History

The facts relevant to the disposition of the cross-motions for summary judgment are as follows, and unless otherwise noted, are not disputed:

Plaintiff ("Johnson") filed a First Amendment lawsuit claiming that Defendants violated his free speech rights. Johnson was a senior at New Brighton Area High School during the 2005-2006 school year. (Docket entry nos. 34 & 36, ¶1). On April 25, 2006, the high school held a school-wide assembly featuring a former Harlem Globetrotter, Melvin Adams, who delivered a motivational speech with a focus on diversity and racial tolerance. (Docket entry nos. 34 & 36, ¶10). During his presentation, Mr. Adams called upon students who volunteered to actively participate in the presentation. (Docket entry nos. 34 & 36, ¶11). Once each student was on stage, Mr. Adams would "nickname" the student. (*Ibid*.) Johnson volunteered to participate, was selected by Mr. Adams, and

1

was nicknamed, "Osama bin Laden."[1] (*Ibid*.) Three other students received the nicknames, Brittany Spears, Sandra Bullock and Chris Brown. (Docket entry no. 35-2, ¶10).

The next day, April 26, 2006, numerous students and at least one teacher referred to Johnson as "Osama" or "Osama bin Laden." (Docket entry nos. 34 & 36, ¶12-13). Following his lunch period on April 26, 2006, Johnson stopped in the library to speak with a friend who was sitting alone at a library table. (Docket entry nos. 34 & 36, ¶14). The parties disagree with respect to the content of the conversation which transpired between Johnson and his friend.

Johnson claims that when he approached his friend she asked, "what's up Osama?" (Docket entry no. 35-2, ¶19). Johnson said that he replied, in a joking fashion, "If I were Osama, I would already have pulled a Columbine." (*Ibid*.) Defendants claim, through their teacher, Mrs. Mercer, who was present in the library at the time of the incident, that Johnson's friend "yelled over and said, 'yo, Osama, go to class.'" (Docket entry no. 36, ¶15). According to Mrs. Mercer, Johnson responded by saying, "'If you guys don't quit calling me that, I'm going to pull a Columbine'." (Docket entry nos. 34 & 36, ¶17). Mrs. Mercer described Johnson's tone of voice as "angry" at the time he made this Columbine comment, but admitted Johnson did not yell nor make the statement in loud fashion. (Docket entry no. 35-6, depo. p. 17). Mrs. Mercer said she thought Johnson's statement was a threat because of his word choice – "Columbine" – which "everybody knows...means shooting" and his grammar choice (meaning his use of future tense) when making the statement. (Docket entry no. 35-6, depo. pp. 18 -19). Mrs. Mercer said she thought Johnson ought to be punished for making the statement and that if he claimed he was joking, or making a joke, he

---

[1] There is no indication in the record that Johnson is of Middle Eastern descent nor that he is Muslim. Although Mr. Adams referred to Johnson as "Osama" several times during the presentation, it is uncontested that those present at this assembly, including Johnson, laughed whenever the "Osama" nickname was used.

2

should not be allowed to escape punishment because, "kids nowadays try to get out of everything." (Docket entry no. 35-6, depo. p. 28-29).

The parties agree that after hearing Johnson's response, Mrs. Mercer "just looked at the two of them," did not try to prevent Johnson from backing out of the library and walking down the hall, nor did she call down the hall after him, but rather, she (at least momentarily) went about her normal business. (Docket entry no. 35-6, depo. pp. 12, 22). However, within minutes of hearing the Columbine comment, Mrs. Mercer telephoned administration to "get assistance," and when her call went unanswered, she sent an e-mail to principal Kasparek and assistant principal Passarelli. (Docket entry no. 35-6, depo. pp. 12, 22). In this email, Mrs. Mercer stated:

> Just thought you would want to know...Cory Johnson just walked into the library. Someone said, "go to class, Osama." He said, "someone calls me that again, I'm going to do a Columbine on this school." He may have been kidding, but he does seem very angry. I just do not think that it is something to joke about. Traci

(Docket entry no. 35-8, p. 4).

After typing the email, Mrs. Mercer asked her intern to stay with the students in the library and went to look for assistant principal Passarelli. (Docket entry no. 35-6, depo. p. 12). She and Passarelli returned to the library and together they questioned two students as to what they heard Johnson say. (Docket entry no. 35-6, depo. pp. 15, 30). Both students refused to repeat it and refused to write down their recollection of Johnson's statement. (Docket entry no. 35-6, depo. p. 150).

Assistant principal Passarelli went to look for principal Kasparek, and after making him aware of the situation involving Johnson, Kasparek asked Passarelli to do more investigation to determine if Johnson had actually made the statement, which would constitute a threat, or not. (Docket entry no. 35-4, depo. p. 25). Assistant principal Passarelli called Johnson out of his classroom to discuss the library incident, and although Johnson admitted he made a comment about

3

Columbine, he said he did not mean it and was only joking around. (Docket entry nos. 34 & 36, ¶25).

Assistant principal Passarelli told principal Kasparek that Johnson admitted to making the statement, and Kasparek directed him to inform New Brighton School District Superintendent, John Osheka, of the situation. (Docket entry no. 35-4, depo. p. 29). Upon his return from talking with superintendent Osheka, Passarelli told Kasparek that Osheka had recommended a 10-day suspension. (*Id*., p. 40-41).

Principal Kasparek then met with Johnson who admitted that he had made a statement referencing Columbine, but again, explained that he intended the remark as a joke. (Docket entry nos. 34 & 36, ¶26). Kasparek admitted that during the time he talked to Johnson, he was aware that Johnson had been involved with a prior incident in "town" involving a handgun. (Docket entry no. 35-4, depo. pp. 35, 60). During this conversation with Johnson, he told Johnson he was suspended, and precluded him from attending the senior prom. (Docket entry nos. 34 & 36, ¶28). He left Johnson in his conference room with a security guard in order to call Johnson's parents and to call the police to report that a threat had been made. (Docket entry no. 35-4, depo. p. 45). By the time he completed the telephone calls, the police officer was in the hallway. (*Id.*, p. 49). The police officer did not question Johnson, did not search his locker, nor conduct any sort of investigation. (*Id*., p. 50).

Superintendent Osheka testified that since Johnson had no prior record relating to any school offense, had "decent grades," and the school officials had no desire to "ruin his future" considering he would graduate within a few days, it was determined that a ten-day suspension was sufficient punishment and school officials opted not to expel him. (Docket entry no. 35-7, depo. p. 18). Although superintendent Osheka admitted he knew that Johnson had been arrested for possession

4

of a firearm and assaulting another individual in town, he explained that the ten-day suspension was warranted because the Columbine statement constituted "a terroristic threat," and Johnson's words alone formed the basis for the ten-day suspension. (*Id*. at pp. 18, 31.)

Based on these facts, both parties moved for summary judgment and rely primarily on Supreme Court case law in support of their respective positions.

## II. Analysis

### A. Standard of Review

Under F.R.Civ.P. 56, summary judgment shall be rendered if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. F.R.Civ.P. 56(c) (2008). An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant. *Singletary v. Pa. Dep't of Corr.*, 266 F.3d 186, 192 (3d Cir. 2001) *citing, Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). "[T]he existence of disputed issues of material fact should be ascertained by resolving all inferences, doubts and issues of credibility against the moving party." *Ely v. Hall's Motor Transit Co.*, 590 F.2d 62, 66 (3d Cir. 1978) (quoting, *Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir. 1972)).

Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element essential to that party's case, and for which that party will bear

the burden of proof at trial. *Celotex*, 477 U.S. at 325 (party can move for summary judgment by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."). The moving party bears the initial burden of identifying evidence that demonstrates the absence of a genuine issue of material fact. Once that burden has been met, the non-moving party must set forth ". . . specific facts showing that there is a genuine issue for trial . . ." or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. *Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

Stated another way, "[w]here the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" Matsushita, at 587. The inquiry, then, involves determining "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990), *cert. den.*, 501 U.S. 1218, 111 S. Ct. 2827, 115 L. Ed. 2d 997 (1991) (quoting *Anderson*, 477 U.S. at 251-52). If a court concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. *Anderson*, 477 U.S. at 249-50.

**B. Discussion**

In support of his motion for summary judgment and in response to Defendants' arguments, Plaintiff relies on *Tinker v. Des Moines Independent Community School*, 393 U.S. 503, 89 S.Ct. 733, 21 L. Ed. 2d 731 (1969). Defendants' rely on *Tinker* as well, but they also look to its progeny, especially *Morse v. Frederick*, ___ U.S. ___, 127 S.Ct. 2618, 168 L. Ed. 2d 290 (2007). Although neither of these Supreme Court cases mirror the facts presented in the instant matter, these and two

other Supreme Court decisions discuss when First Amendment free speech rights exist within a school environment. I rely on the rationale behind all of these decisions in rendering my decision in this case.

Starting with *Tinker,* the Supreme Court upheld the students' First Amendment rights in a school setting. In *Tinker*, school authorities adopted a policy/regulation indicating that any student wearing an armband to school would be asked to remove it. If a student refused to remove it, he or she would be suspended from school. The adoption of this policy occurred a few days before a group of students wore black armbands to profess their objections to the hostilities in Vietnam and their support for a truce. When a few armband-wearing students refused to remove the armbands, the school suspended them. These students sought an injunction from the District Court of Southern Iowa restraining the school officials from disciplining them in this fashion and for nominal damages.

The Supreme Court held that the school regulation prohibiting students from wearing the armbands violated free speech rights under the First Amendment. The Court generally refused to enable state-operated schools to become "enclaves of totalitarianism" with "absolute authority over the students," but, importantly, it still found that "conduct by the student, in class or out of it, which for any reason ... materially disrupts classwork or involves substantial disorder or invasion of the rights of others, is ... not immunized by the constitutional guarantee of freedom of speech." 393 U.S. at 511, 513. The Court determined that because there was no reason to anticipate that the wearing of armbands would substantially interfere with the work of the school or impinge on the rights of other students, the school regulation violated the students' free speech rights. *Id.* at 514.

In *Tinker*, the Court held that wearing armbands for the purpose of expressing a certain political viewpoint was the type of symbolic speech which fell within First Amendment protection

and further noted that the wearing of the armbands was an act "entirely divorced from actually or potentially disruptive conduct" and involved direct, First Amendment rights akin to "pure speech." *Id*. at 505. In deciding *Tinker,* the Supreme Court struck a balance between enabling students and teachers to maintain their First Amendment rights once through the "schoolhouse gate" and acknowledging the need for affirming the authority of school officials to "prescribe and control conduct in the schools." *Id.* at 506-507.

> "Any word spoken, in class, in the lunchroom, or on the campus that deviates from the views of another person may start an argument or cause a disturbance.
>
> \*   \*   \*
>
> In order for the State in the person of school officials to justify prohibition of a particular expression of opinion, it must be able to show that its action was caused by something more than a mere desire to avoid discomfort and unpleasantness that always accompany an unpopular viewpoint."

Id. at 508-509.

Seventeen years after *Tinker*, the Court in *Bethel School Dist. No. 403 v. Fraser*, 478 U.S. 675, 106 S. Ct. 3159, 92 L. Ed. 2d 549 (1986), carved out an exception from *Tinker* by distinguishing the facts and holding in *Tinker*. In *Fraser*, a student, (Fraser), delivered a speech to over 600 other students (many of whom were 14 years old) during which he nominated a fellow student for a student government office. 478 U.S. at 678. The speech utilized sexual metaphors when referring to the candidate. *Ibid*. Prior to giving the speech, he discussed the content of the speech with two teachers who advised him that the speech was "inappropriate," could lead to "severe consequences," and suggested he not deliver it. *Ibid*. Acting against their advice as well as a school disciplinary rule prohibiting students from "materially and substantially" interfering with the educational process (which included the use of obscene, profane language or gestures), the student delivered his speech.

8

*Ibid.*

During the speech, some students in the audience hooted and yelled, some gestured graphically and simulated the sexual activities Fraser referenced in his speech. *Ibid*. The day after Fraser delivered the speech, one teacher reported that she had to forego a portion of her lesson plan to discuss the speech with her class. The assistant principle presented Fraser with copies of five letters from teachers. Fraser admitted that he deliberately used the sexual innuendo in his speech, received a three-day suspension, and was not permitted to speak at the school's commencement exercises. *Ibid*.

The District Court and the Court of Appeals, relying on *Tinker*, held that Fraser should not have been sanctioned for his speech. The Supreme Court disagreed, distinguishing *Fraser* from *Tinker*. The *Fraser* Court held that in *Tinker*, it was "careful to note that the case did 'not concern speech or action that intrudes upon the work of the schools or the rights of other students.' " 478 U.S. at 680, citing *Tinker*, 393 U.S. at 508. The *Fraser* Court determined that it was "a highly appropriate function of public school education to prohibit the use of vulgar and offensive terms in public discourse," and further explained that "the fundamental values necessary to the maintenance of a democratic political system disfavor the use of terms of debate highly offensive or threatening to others." 478 U.S. at 683. In short, the *Fraser* Court drew a distinction between the different *form* or *type* of speech at issue in its own case as compared to the type of speech at issue in *Tinker*. Specifically, the *Fraser* Court stated:

> Unlike the sanctions imposed on the students wearing armbands in *Tinker*, the penalties imposed in this case were unrelated to any political viewpoint. The First Amendment does not prevent school officials from determining that to permit vulgar and lewd speech such as respondent's would undermine the school's basic educational mission.

9

*Id.* at 685.

Because the facts of this case were so distinguishable from *Tinker*, the Supreme Court deemed it "perfectly appropriate" for the school to censor the speech of the student. The *Fraser* Court also referred to Justice Black's position set forth in his *Tinker* dissent, wherein he noted that the Federal Constitution does not compel teachers, parents and elected school officials to surrender control of the public school system to its students.

Freedom of speech within a school environment was next addressed by the Supreme Court in *Hazelwood School District v. Kuhlmeier*, 484 U.S. 260, 108 S.Ct. 562, 98 L.Ed.2d 592 (1988). In *Kuhlmeier*, certain high school students who served as staff members of the school's newspaper filed suit in federal court claiming their First Amendment rights were violated when the principal ordered the deletion of two pages of the newspaper. One page contained an article describing school students' experiences with pregnancy, while another page held an article discussing a student's view on the impact of divorce. The school's principal, who had final authority over the newspaper's content, objected to the pregnancy story because he believed that the text of the article would lead to the identification of those students who were pregnant and because the article's references to sexual activity and birth control were inappropriate for younger students. The principal objected to the divorce article because the student's father was not given an opportunity to comment on the sharp, critical statements made by the student about him.

The district court held that the students' First Amendment rights had not been violated by the two-page censorship imposed by the school's principal, but the Eighth Circuit reversed. Siding with the district court on this matter, the Supreme Court held that it was reasonable for the principal to conclude that the content of the articles was not suitable for publication in the school's newspaper.

*Id.* at 276.

The *Kuhlmeier* Court harmonized the *Tinker* and *Fraser* holdings by concluding that even though students do not shed their constitutional rights at the schoolhouse gate, "...the First Amendment rights of students in public schools 'are not automatically coextensive with the rights of adults in other settings,'[*Fraser* cite omitted], and 'must be applied in light of the special characteristics of the school environment.'[*Tinker* cite omitted]." *Kuhlmeier,* 484 U.S. at 266. Per the *Kuhlmeier* Court, a school can censor student speech without violating the First Amendment when the speech is "inconsistent with its basic educational mission ... even though a government could not censor similar speech outside the school." *Ibid*.

In the most recent Supreme Court case involving free speech within a school environment, *Morse v. Frederick*, ___ U.S. __, 127 S.Ct. 2618, 168 L.Ed.2d 290 (2007), the Court began its analysis by harmonizing *Tinker*, *Fraser* and *Kuhlmeier*:

> Our cases make clear that students do not 'shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.' [*Tinker* cite omitted] At the same time we have held that 'the constitutional rights of students in a public school are not automatically coextensive with the rights of adults in other settings' [*Fraser* cite omitted] and that the rights of students 'must be applied in light of the special characteristics of the school environment' [*Kuhlmeier* cite omitted]. Consistent with these principles, we hold that schools may take steps to safeguard those entrusted to their care from speech that can reasonably be regarded as encouraging illegal drug use.

*Morse*, 127 S.Ct. at 2622.

In *Morse*, several students unfurled a 14-foot banner at a school-sponsored event which bore the phrase, "BONG HiTS 4 JESUS." After the principal (Morse) demanded that the banner be taken down, all of the students except for Frederick complied with her directive. Morse suspended Frederick for ten days.

Frederick filed suit in federal district court claiming his First Amendment rights were violated, but the court granted summary judgment in favor of the school board finding it: (1) was entitled to qualified immunity, (2) had not violated Frederick's First Amendment rights, and (3) the principal had reasonably interpreted the banner as promoting illegal drug use which contravened the school's drug policy. On appeal, the Ninth Circuit reversed, concluding that the school failed to demonstrate how Frederick's speech "gave rise to a risk of substantial disruption" as set forth in *Tinker*.

Specifically rejecting application of *Tinker's* substantial disruption test, the *Morse* Court explained that because of the magnitude of the interest at stake (*i.e.* the serious and palpable danger that drug abuse presents to the health and well-being of students), deterring drug use was a highly important, if not compelling, interest. And, as set forth in *Fraser*, the *Morse* Court reiterated that public school students' constitutional rights are not "automatically coextensive with the rights of adults in other settings" holding that *Tinker's* mode of analysis is not absolute especially considering that neither *Fraser* nor *Kuhlmeier* used the "substantial disruption test" announced in *Tinker*. *Id*. at 2626-2627.

Although the *Morse* Court labeled the message on Frederick's banner "cryptic," it held that the principal reasonably interpreted it as promoting illegal drug use. *Id*. at 2624. The *Morse* Court held that the principal did not violate Frederick's First Amendment rights by restricting his speech at a school event because the speech could reasonably be viewed as promoting illegal drug use. *Ibid*.[2]

---

[2] The Court recognized that under the facts of the case, the principal had to make a fast decision to act, or not act, and employ some independent judgment. *Id*. at 2629. The *Morse* dissent criticized the plurality opinion claiming it authorized "viewpoint discrimination," but even the dissenting Justices conceded that "some targeted viewpoint

The *Morse* Court held that "the special characteristics of the school environment" combined with governmental interest in stopping student drug abuse, allowed the school to restrict student expression promoting illegal drug use. *Id*. at 2629. The Supreme Court specifically pointed out that *Tinker* warned schools not to prohibit speech because of "undifferentiated fear or apprehension of a disturbance" or a "mere desire to avoid the discomfort and unpleasantness that always accompany an unpopular viewpoint." When applied to its own facts, the *Morse* Court determined the particular concern (preventing student drug abuse) extended "well beyond an abstract desire to avoid controversy." *Ibid*. However, the *Morse* Court refused to adopt a broader rule that Frederick's speech was simply proscribable because it was "offensive" as that term was used in *Fraser*.

In addition to the four free speech cases decided within the confines of a school environment, the Supreme Court has consistently held that First Amendment protections for speech and expressive conduct are not absolute in certain other settings and situations. For example, the Court has long recognized that government may regulate certain categories of expression consistent with the Constitution. *See*, *e.g.*, *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-572, 62 S. Ct. 766, 86 L. Ed. 1031 (1942). The Court has also held that the First Amendment can be read so as to allow a State to ban a "true threat." *Watts v. United States*, 394 U.S. 705, 708, 89 S. Ct. 1399, 22 L. Ed. 2d 664, (1969); *accord*, *R. A. V. v. St. Paul*, 505 U.S. 377, 388, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) (threats of violence are outside the First Amendment). "True threats" encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals. *See Watts,* 394 U.S. at 708 ("political hyberbole" is not a true threat); *R. A. V. v. City of St. Paul*, 505 U.S., at 388. Moreover,

---

discrimination in this unique setting" might be appropriate. *Id*.

the speaker need not actually intend to carry out the threat. Rather, a prohibition on true threats "protects individuals from the fear of violence" and "from the disruption that fear engenders," in addition to protecting people "from the possibility that the threatened violence will occur." *Ibid*.

Turning to the case now before me, the uncontroverted evidence of record clearly illustrates the depth of the school's concern for the safety of all other school students, based largely upon Mrs. Mercer's perception of what Johnson said and how he said it. Within minutes of hearing the comment, Mrs. Mercer first called via telephone, then emailed, then physically sought out a school administrator to report Johnson's statement and her concerns about it. Plaintiff does not dispute that Mrs. Mercer heard and perceived Johnson's words as a threat; instead, he attempts to raise an issue of fact by testifying that he did not say exactly what Mrs. Mercer heard, and he suggests that no matter what he actually said, he simply meant it as a joke and had no intent to act on his words.

Applying *Tinker* and *Morse*, along with *Chaplinsky*, *Watts*, and *R.A.V.*, it is Mrs. Mercer's perception and viewpoint that matter in terms of the disposition of these motions for summary judgment. Plaintiff does not suggest, nor does he offer any evidence to support a claim that Mrs. Mercer's perception or viewpoint was clouded by some ulterior motive to malign him or some sort of an incapacity that rendered her unable to hear him or correctly perceive his statements.

After Mrs. Mercer conveyed her concern to assistant principal Passarelli, Mr. Passarelli began an investigation, spoke with the principal, spoke with Johnson, reported back to the principal and got a recommendation from the superintendent. Principal Kasparek, upon first learning of the statement uttered by Johnson, asked Passarelli to interview Johnson and when Passarelli reported that Johnson had made a statement referencing Columbine, he met with Johnson himself. After personally hearing Johnson's account of the incident, Kasparek notified the police and Johnson's

14

parents. Johnson contradicts none of this evidence (again, with the exception as to exactly what he said while in the library and what sort of tone he took when saying it).

Thus, all evidence presented supports the fact that the teacher and school administrators, at a minimum, perceived Johnson's speech to be in violation of the core educational mission of the school, and more importantly, led them to be concerned for the safety of all the other school students. The teacher and school officials had to decide whether to take instant action or do nothing.

Based on the evidence presented in the parties' submissions, it is clear that Mrs. Mercer, assistant principal Passarelli, principal Kasparek, and superintendent Osheka took the actions they did (which led to a 10-day suspension of Johnson) <u>not</u> out of a "mere desire to avoid ... the unpleasantness that always accompany an unpopular viewpoint" as *Tinker* suggests. Rather, the record before me clearly illustrates facts which meet *Tinker*'s requirement that Mrs. Mercer and the other school authorities reasonably believed "substantial disruption or material interference with school activities" would occur and acted on that belief as opposed to acting upon a mere "wish to avoid controversy."

In addition, Johnson's statement referencing "Columbine," which, pursuant to Mrs. Mercer's viewpoint was expressed in anger, cannot be "entirely divorced from actually or <u>potentially</u> disruptive conduct," and certainly is not akin to "pure speech" as required by *Tinker*. *Tinker, supra.*, at 505 (emphasis added). To the contrary, the record in this case unequivocally reflects that the school officials acted quickly on Johnson's statement which they perceived to be a threat in order to protect the other students from the possibility that Johnson would become violent.

In sum, Johnson's statement with its reference to Columbine falls well outside the bounds of "political speech" described in *Tinker*. Instead it is more akin to "fighting words," or "true

15

threats" which the Supreme Court clearly refuses to protect under the First Amendment in *Chaplinsky, Watts* and *R.A.V.* Even the dissenting *Morse* Justices noted that the First Amendment fails to protect student speech when the message "expressly advocates conduct that is illegal or harmful to students."

In today's society, the term "Columbine," connotes death as a result of one or more students shooting other students and school staff. Therefore, when a student uses that term, and, from the school's viewpoint, utters the term with malice or anger while within the confines of the school yard, it can readily be viewed at a minimum as "fighting words" or a "true threat" or "advocating conduct harmful to other students."

Finally, despite Johnson's otherwise "clean" record from kindergarten through his senior year of high school, our society today charges teachers, school officials and administrators with the responsibility to provide students not only with an environment conducive for learning, but one that is safe. While the dissenting Justices in *Morse* express valid concern about "viewpoint discrimination" (*i.e.* Mrs. Mercer's, Mr. Passarelli's, Mr. Kasparek's and Mr. Osheka's viewpoint or perception of Johnson's statement), even they agree that under certain circumstances, viewpoint discrimination may be warranted. *Morse*, 127 S.Ct. at 2646. Given the school's viewpoint, Johnson's statement advocated conduct harmful to all other students. Given all of the case law on this issue, I simply find no First Amendment protection for Johnson's speech.

For all of the foregoing reasons, I am granting the Defendants' motion for summary judgment and denying the Plaintiff's cross-motion for summary judgment.

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Cory Johnson, | ) |
| | ) |
| Plaintiff, | ) Civil Action No. 06-1672 |
| -vs- | ) |
| | ) |
| New Brighton Area School District, | ) |
| John Osheka, Edward D. Kasparek, Jr., | ) |
| and Luca J. Passarelli | ) |
| | ) |
| Defendants. | ) |

AMBROSE, Chief District Judge.

## **ORDER**

AND now, this 11th day of September, 2008, for the reasons set forth in the accompanying Opinion, it is hereby ordered that Plaintiff's Motion for Summary Judgment [Doc. No. 32] is denied and Defendants' Motion for Summary Judgment [Doc. No. 28] is granted.

BY THE COURT:

s/ Donetta W. Ambrose
Donetta W. Ambrose,
Chief U.S. District Judge